# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

THI MARILYN DANG,
        *Defendant-Appellant.*

No. 04-17529

D.C. No.
CV-01-01514-WBS/
DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted
December 7, 2006—San Francisco, California

Filed May 24, 2007

Before: Michael Daly Hawkins, A. Wallace Tashima, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

## COUNSEL

James P. Mayo, Segal & Kirby, Sacramento, California, for
the appellant.

Peter D. Keisler, Barry J. Pettinato, and Patricia M. Corrales-Talleda, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Los Angeles, California, for the appellee.

---

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question, among others, as to the constitutionality and validity of the Department of Homeland Security's regulation pertaining to assessment of good moral character in naturalization proceedings. We conclude that the regulation passes constitutional muster and is not *ultra vires* as to its governing statute. We affirm the judgment of the district court.

I

After thirteen years of lawful permanent residence, Marilyn Thi Dang filed an Application for Naturalization with the Immigration and Naturalization Service ("INS") on June 28, 1995. On February 2, 1996, Dang intentionally set fire to her van, severely burning herself and her four-month-old son. Meanwhile, the INS had been processing Dang's application for naturalization. On March 12, 1996, after Dang had set fire to the van, Dang was interviewed under oath by an INS officer regarding her citizenship application. During the interview, Dang was asked, "Have you ever knowingly committed any crime for which you have not been arrested?" and Dang answered in the negative. The INS approved her application the same day. The next day, March 13, 1996, Dang was arrested and charged with arson, willful injury to a child, making a false report of a criminal offense, and two counts of insurance fraud.

On April 3, 1996, Dang—out on bail—was administered the oath of allegiance and admitted to United States citizenship. As a prerequisite to naturalization, applicants were required to complete questions on a Notice of Naturalization Oath Ceremony Form N-455A. One of the questions on the form asked: "After the date you were first interviewed . . . have you been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance, including traffic violations?" Dang's form was checked "No" in response.

On September 30, 1996, Dang was sentenced to an eleven-year term of imprisonment after being convicted of all charges arising out of the February 2, 1996 incident.

Roughly five years later, on August 6, 2001, the government filed a two-count complaint in federal court against Dang for denaturalization on the basis that Dang's citizenship was "illegally procured" and "procured by concealment of a material fact or by willful misrepresentation," pursuant to 8 U.S.C. § 1451(a). As required by § 1451(a), the government attached an "affidavit of good cause" for initiating denaturalization proceedings against Dang. The first count of the complaint alleged that Dang falsely testified during her naturalization interview, revealing a lack of good moral character, and therefore illegally procured citizenship. The second count alleged that Dang willfully misrepresented her criminal history both during the naturalization interview and on the N-455A, thereby falsely procuring citizenship. Both counts were based on Dang's purported misrepresentations to the INS.

On December 18, 2002, the district court issued a Pre-Trial Scheduling Order pursuant to Federal Rule of Civil Procedure 16. In accordance with Rule 16, the scheduling order provided for the amendment of pleadings thenceforth only upon leave of the court and a showing of "good cause." *See* Fed. R. Civ. P. 16(b).

In October 2003—after learning of information that would make it more difficult for it to prove its two misrepresentation-based counts[1]—the government sought to amend its complaint to include a third count, pursuant to 8 C.F.R. § 316.10(b)(3)(iii). Under this new Count III, the government would not be required to prove Dang's willful misrepresentation to the INS. It would only need to show that Dang committed unlawful acts—for which she was later convicted or imprisoned—during the statutory good moral character period. 8 C.F.R. § 316.10(b)(3)(iii). The district court granted the government's motion to amend the complaint pursuant to Rule 16(b) in November of 2003.

Dang then filed a motion to dismiss the government's amended complaint, arguing that it was barred by laches, was not accompanied by a second affidavit of good cause, and failed to state a cause of action. The district court denied this motion in its entirety. The government then filed a motion for summary judgment with regard to Count III of the amended complaint. The district court granted the motion, finding that, based on her commission of unlawful acts during the relevant statutory period, Dang had not established the good moral character required for naturalization. *See* 8 C.F.R. § 316.10(b)(3)(iii). The court entered judgment against Dang that revoked Dang's citizenship and cancelled her certificate of naturalization.

## II

American citizenship is "a right no less precious than life or liberty, indeed of one which today comprehends those rights and almost all others." *Klapprott v. United States,* 335 U.S. 601, 616 (1949) (Rutledge, J., concurring). In order to be naturalized, an applicant must demonstrate that he or she satisfies the numerous statutory criteria of the Immigration and

---

[1]Specifically, the government learned that it may have been *Dang's daughter* who filled out form N-455A, not Dang herself.

Naturalization Act, including the requirement that the applicant "has been and still is a person of good moral character" during the statutorily defined period of residency. 8 U.S.C. § 1427(a).

Because citizenship is a precious right, "once citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko v. United States,* 449 U.S. 490, 505 (1981). Because of this, "the Government 'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship.' " *Id.* (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)). "The evidence justifying revocation of citizenship must be clear, unequivocal, and convincing and not leave the issue in doubt." *Id.* (internal quotation marks and citations omitted).

**[1]** The denaturalization statute, 8 U.S.C. § 1451(a), provides that denaturalization may be commenced if the citizen's naturalization was (1) "illegally procured," or (2) "procured by concealment of a material fact or by willful misrepresentation." In order lawfully to obtain U.S. citizenship, a person must be of "good moral character" for the five years immediately preceding the date of filing her citizenship application, as well as from the date of filing this application until the date she or he is admitted to citizenship. Under 8 U.S.C. § 1101(f), a person shall not "be regarded as, or found to be, a person of good moral character" if, within the statutory period, he or she fell into any of seven enumerated categories.[2] Section 1101(f) concludes: "The fact that any person is not within any

---

[2] The categories are as follows: (1) a habitual drunkard, (2) an admitted or convicted prostitute, smuggler, polygamist, moral turpitude criminal, drug user as defined by statute, or drug trafficker (during the relevant good moral character period), (3) gambler deriving substantial income from gambling, (4) one convicted of two or more gambling offenses during the statutory period, (5) one who gives false testimony for obtaining naturalization, (6) one who has been confined in a penal institution for more than 180 days during the statutory period, (7) one convicted of an aggravated felony, at any time.

of the foregoing classes shall not preclude a finding that for other reasons such a person is or was not of good moral character." *Id.* ("catch-all provision").

**[2]** Pursuant to § 1101(f), the Department of Homeland Security (subsuming the former Immigration and Naturalization Service) promulgated regulation 8 C.F.R. § 316.10. The regulation offers guidance to officials making moral character determinations, stating as a general matter that "the Service shall evaluate claims of good moral character on a case-by-case basis taking into account the elements enumerated in this section and the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). Among those elements to be considered, the regulation restates the enumerated categories of § 1101(f) in § 316.10(b)(1)-(2). Among those "elements enumerated in this section" are the same seven categories as are listed in 8 U.S.C. § 1101(f), *see* 8 C.F.R. § 316.10(b)(1)-(2), as well as the following:

> Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b)(1) or (2).

8 U.S.C. § 316.10(b)(3)(iii). The Supreme Court has required "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured' . . . ." *Fedorenko*, 449 U.S. at 506. The government's final theory, upon which the district court granted summary judgment, was that Dang committed the unlawful acts during the statutory period prior to naturalization and, thus, her naturalization was illegally procured even

though the conviction for those acts did not occur until after naturalization.

## A

Dang argues that the regulation, 8 C.F.R. § 316.10(b)(3)(iii), is *ultra vires* to the statute. In particular, Dang contends that because § 1107(f)(3) specifically limits an unfavorable moral character determination based on criminal activity to people who were convicted of—or had admitted to—the relevant crime during the statutory good moral character period, Congress has unambiguously prohibited adverse "good moral character" findings based on conduct underlying convictions that were entered outside the five-year good moral character period.

In deciding whether an administrative agency's regulation is a permissive construction of the governing statute, we employ the analysis set forth by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), as further explained in *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). Under *Chevron*, we must consider first "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. "If Congress has done so, the inquiry is at an end; [we] 'must give effect to the unambiguously expressed intent of Congress.' " *Brown & Williamson*, 529 U.S. at 132 (quoting *Chevron*, 467 U.S. at 843). In making that assessment, we not only look at the precise statutory section in question, but we also analyze the provision in the context of the governing statute as a whole, presuming congressional intent to create a "symmetrical and coherent regulatory scheme." *Id.* at 133 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). Finally, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate [such an important] policy decision . . . ." *Id.* If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we "must respect the

agency's construction of the statute so long as it is permissible." *Id.* at 132 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999), and *Auer v. Robbins*, 519 U.S. 452, 457 (1997)).

[3] The key question in the present context is whether Congress directly addressed the issue, or left a statutory gap for the agency to fill. "In *Chevron*, [the Supreme] Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). "*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps." *Id.* at 982.

[4] Here, a plain reading of the statute indicates that Congress intended to leave a statutory gap for the administrative agency to fill. Section 1101(f)'s catch-all provision, stating that "other reasons" can be considered in determining that a person is not of good moral character, demonstrates a gap that "Congress explicitly left for the agency to fill." *Chevron*, 467 U.S. at 843. Therefore, given the statutory gap deliberately established by Congress, the question before us is whether the agency's regulatory interpretation of the statute is permissible. We conclude that it is.

[5] Denaturalization based on the commission of unlawful acts during the statutory period is a permissible exercise of congressional delegation. Because the authorizing statute covers conduct both legal and illegal,³ and literally invites the agency to expand the list of acts warranting adverse moral character determinations, *see* § 1101(f) (catch-all provision), it cannot be reasonably argued that the regulation at issue here

---

³The statute itself requires finding an applicant lacking in good moral character if he or she is a habitual drunkard, *see* 8 U.S.C. § 1101(f)(1), or has given false testimony in an immigration-related proceeding, *see id.* § 1101(f)(6), not to mention if he or she has been convicted of or has engaged in particular types of illegal behavior.

is arbitrary or capricious. Thus, requiring consideration of an applicant's unlawful acts during the five-year moral character period—whether or not the applicant is convicted for the acts during that period—is not beyond the agency's statutory mandate. 8 C.F.R. § 316.10(b)(3)(iii) is entitled to *Chevron* deference and, therefore, is not ultra vires to the governing statute, 8 U.S.C. § 1101(f).**⁴**

B

**[6]** Dang also argues that the regulation is void for vagueness. "[A] party challenging the facial validity of [a regulation] on vagueness grounds outside the domain of the First Amendment must demonstrate that the enactment is impermissibly vague in all of its applications." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotation marks omitted). Of course, under this rubric, if the statute is constitutional as applied to the individual asserting the challenge, the statute is facially valid. *See Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 822 (9th Cir. 2003).

**[7]** The statute is not unconstitutionally vague as applied to Dang. "In examining a statute for vagueness, we must determine whether a person of average intelligence would reasonably understand that the charged conduct is proscribed."

---

**⁴**The Eleventh Circuit recently reached this very question, explaining that a naturalized citizen "who committed certain unlawful acts during the statutory period *prior* to taking the oath of allegiance but for which he was indicted, arrested and convicted *after* naturalization stands to lose his precious acquisition for lack of good moral character." *United States v. Jean-Baptiste*, 395 F.3d 1190, 1191 (11th Cir. 2005) (emphasis in original). That court expressly found that § 316.10(b)(3)(iii) was entitled to *Chevron* deference, reasoning that the catch-all provision provided the agency with significant deference. *Id.* at 1193-94. The court also noted that "this determination is supported by case law." *Id.* at 1194 (citing *DeLuca v. Ashcroft*, 203 F. Supp. 2d 1276, 1279 (M.D. Ala. 2002); *Jiminez v. Eddy*, 153 F. Supp. 2d 1105, 1107 (D. Alaska 2001).

*United States v. Williams*, 441 F.3d 716, 724 (9th Cir. 2006). Dang—convicted of arson, fraud and willful injury of a child —intentionally set fire to her vehicle, severely burning herself and her four-month-old son, with the specific intent to defraud her insurance carrier. A person of ordinary capacity would reasonably understand that those actions constituted "unlawful acts." *Cf. Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 515, 526 (1994) (holding anti-drug paraphernalia statute was not unconstitutionally vague as applied to defendant's case when defendant operated a "full-scale 'head shop,' " selling items such as "pipes, bongs, scales, roach clips, and drug diluents including mannital and inositol" (footnotes omitted)). Therefore, Dang may not properly bring a vagueness challenge to the regulation.

C

**[8]** Dang asserts that the regulation is impermissibly overbroad. The overbreadth doctrine is inapposite to a case in which First Amendment protections are not implicated. *See, e.g.*, *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798-801 (1984) (noting the source of the overbreadth doctrine was a recognition of "the deterrent effect on free expression" under broadly written statutes and evaluating potential overbreadth in the First Amendment context exclusively). This constitutional claim must, therefore, also fail.

D

**[9]** Finally, Dang contends that, as applied to her, 8 C.F.R. § 316.10(b)(3)(iii) runs afoul of the Uniformity Clause of the Constitution. The Uniformity Clause grants Congress the power to "establish an *uniform* Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4 (emphasis added). Dang argues that 8 C.F.R. § 316.10(b)(3)(iii) violates the Uniformity Clause because acts that are unlawful in one state may be lawful in another state due to the variations in state laws, thus making the rule "not uniform" from state to state.

**[10]** To bring a successful facial challenge outside the First Amendment context, "the challenger must establish that no set of circumstances exists under which the [regulation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As with Dang's vagueness challenge, we need not decide whether 8 C.F.R. § 316.10(b)(3)(iii) would withstand a Uniformity Clause challenge in every context: 8 C.F.R. § 316.10(b)(3)(iii) is unquestionably constitutional as applied to Dang. *See United States v. Cheely*, 36 F.3d 1439, 1443-44 n.10 (9th Cir. 1994) (" 'Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the [c]ourt.' " (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (alteration in original)). Dang does not contend that the crimes of arson, willful injury of a child, and fraud would be considered lawful in *any* United States jurisdiction; thus, no uniformity concerns are implicated in this case.

E

**[11]** In sum, 8 C.F.R. § 316.10(b)(3)(iii) is not *ultra vires* to the governing statute and survives constitutional scrutiny as applied to Dang.

III

**[12]** The district court did not abuse its discretion in granting the government's motion to amend its complaint to include the fatal third count. The government filed its two-count complaint against Dang on August 6, 2001. Although the court's Pre-Trial Scheduling order was entered on December 18, 2002, the government moved to amend its complaint to include Count III in October of 2003. Because the government sought to amend its complaint well after the court issued its Rule 16 scheduling order, the government was required to

demonstrate "good cause" for modifying the order. *See* Fed. R. Civ. P. 16(b); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992).

**[13]** To support her claim, Dang points out that the facts and theories underlying Count III were available to the government since the inception of the action. We agree with this assertion and conclude that the district court *could* have properly denied the motion to amend on this basis. The district court did acknowledge that the government was able to bring the claim earlier in the proceedings and indicated its disapproval with the government for not doing so.[5] Nevertheless, the court granted the motion based on an overall evaluation of "[t]he rights of the parties, the ends of justice, and judicial economy." We cannot say that this was an abuse of discretion. Indeed, "the district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion." *Id.* at 607 (quoting *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir. 1985)).

IV

Nor did the district court err by allowing the government to file the amended complaint without submitting a supplementary affidavit of good cause. Under 8 U.S.C. § 1451, the government is required to submit an affidavit of good cause to institute naturalization proceedings against a naturalized citizen. 8 U.S.C. § 1451(a). Conceding that the original complaint was filed with a proper affidavit, Dang argues that the

---

[5]We note, however, that new facts came to the government's attention shortly before it moved to amend its complaint in the form of the deposition of a late-identified witness, Dang's daughter, Rachel Nguyen, who was not made available for her deposition until after the Pre-Trial Conference. Nguyen testified that it was she, and not Dang, who filled out the answers on Dang's Form N-455A.

government's amended complaint should have included a second, supplementary affidavit of good cause.

An affidavit of good cause is only required at the initiation of a denaturalization proceeding. *See* 8 U.S.C. § 1451(a) ("It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, *to institute* proceedings . . . ." (emphasis added)); *United States v. Zucca*, 351 U.S. 91, 100 (1956) (announcing the principle that the affidavit showing good cause is "a prerequisite to the *initiation* of [denaturalization] proceedings" (emphasis added)). This reading of the statute is consistent with its purposes. The Supreme Court has noted: "Even if his citizenship is not cancelled, his reputation is tarnished and his standing in the community damaged. Congress recognized this danger and provided that a person, once admitted to American citizenship, should not be subject to legal proceedings to defend his citizenship without a preliminary showing of good cause." *Id.* at 99-100. By the time the amended complaint was filed, the denaturalization proceeding had already commenced; Dang's reputation had been compromised and the preliminary showing of good cause had been made.[6]

---

[6]We should also note that any hypothetical supplementary affidavit of good cause would be substantially identical to the one originally filed. The affidavit submitted by the government stated:

> [O]n February 2, 1996, approximately one month before her naturalization interview, Ms. Dang committed the crimes of arson, willful injury to a child, and filing a false report of a criminal offense. Additionally, between February 2, 1996 and April 15, 1996, Ms. Dang committed the crime of making false or fraudulent claims or statements.

This very allegation remained the basis of the government's amended complaint, which added Count III for committing "unlawful acts" during the good moral character period.

## V

Dang's laches defense must also fail. It remains an open question in this circuit as to whether laches is a permissible defense to a denaturalization proceeding. Dang relies on *Costello*, the most recent Supreme Court case to examine the question. Although noting that laches is not, as a general matter, a defense against the sovereign, *Costello* reserved judgment on the applicability of the defense to a denaturalization action. 365 U.S. at 281. The Court held: "[E]ven if we assume the applicability of laches, we think that the petitioner failed to prove both elements which are necessary to the recognition of the defense." *Id.* at 282. As in *Costello*, we hold that even assuming that laches is a permissible defense, Dang did not make out the required elements of the defense.[7]

[14] "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* at 282. Dang has not shown a lack of diligence on the part of the government. She argues that the government was dilatory because it filed its initial complaint five years after Dang's naturalization and convictions. However, the government was working to denaturalize Dang administratively until this court's decision in *Gorbach v. Reno*, which held that the Attorney General lacked statutory authority to revoke citizenship through administrative denaturalization proceedings. 219 F.3d 1087, 1092-98 (9th Cir. 2000) (en banc). Soon thereafter, the government filed its complaint in federal district court. Further,

---

[7]Other courts—including district courts within our circuit—have interpreted *Costello* as actually *foreclosing* applicability of the defense. *See, e.g.*, *United States v. Mandycz*, 447 F.3d 951, 965 (6th Cir. 2006) ("the 'primary holding' of *Costello*, we have already decided, is that 'laches [is] inapplicable,' " (quoting *United States v. Weintraub*, 613 F.2d 612, 618-19 (6th Cir. 1979))); *United States v. Wang*, 404 F. Supp. 2d 1155, 1158-59 (N.D. Cal. 2005); *United States v. Shuck*, 565 F. Supp. 613, 615 (E.D. Pa. 1983). Because Dang fails to assert a viable laches defense, we do not resolve the question here.

most denaturalization proceedings are instituted beyond the five-year period Dang argues is objectionable. *See, e.g.*, *Costello*, 365 U.S. at 268 (claim brought 27 years after naturalization); *Kungys v. United States*, 485 U.S. 759, 764 (1988) (34 years); *Fedorenko*, 449 U.S. 490, 497 (1981) (7 years). The government was adequately diligent in bringing suit; Dang cannot assert a successful laches defense.

**AFFIRMED.**