In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3476

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSE SUAREZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-06431—**Robert M. Dow, Jr.,** *Judge*.

ARGUED APRIL 4, 2011—DECIDED DECEMBER 16, 2011

Before KANNE, ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*.   Jose Suarez committed two
controlled substance offenses shortly before he applied
for naturalization. Unaware of these offenses, the Im-
migration and Naturalization Service ("INS")[1] approved

---

[1]  Congress transferred the functions of the former INS to the
Department of Homeland Security ("DHS") on March 1, 2003.

(continued...)

his application, and Suarez took the oath of allegiance, becoming a United States citizen. A few months later, he was indicted for the offenses he committed prior to filing his application. After Suarez was convicted and had served his sentence, the United States sought to revoke his naturalization pursuant to 8 U.S.C. § 1451(a). The district court granted the government's motion for summary judgment and revoked his citizenship. Suarez appeals.

## I.

Suarez is a native of Mexico who became a lawful permanent resident of the United States on July 17, 1978. In December 1996, he filed an Application for Naturalization with the INS. He revealed on the Application that he had been arrested for a marijuana crime in the 1980s, and for disorderly conduct and trespassing in the 1990s. He explained to an INS officer that all of the charges had been dismissed. What he did not reveal was that he had recently committed additional marijuana-related offenses for which he had not yet been charged. The

---

[1] (...continued)

The transfer does not affect any legal issue in the case, and the DHS did not exist during any of the underlying administrative proceedings. We will use the terminology in place at the time that the agency considered and approved Suarez's application for naturalization. *See Diallo v. Ashcroft*, 381 F.3d 687, 690 n.1 (7th Cir. 2004).

INS approved his application on April 4, 1998, and Suarez became a citizen on May 14, 1998.

On August 27, 1998, the United States charged Suarez and three other defendants with possession with intent to distribute approximately 196 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1); and conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. Both charges related to the time period between June 1996 and October 22, 1996, a few short months before Suarez applied for naturalization. A jury found Suarez guilty on both counts and the district court sentenced him to an eighty-seven month term of imprisonment. In setting the sentence, the court determined that Suarez would be held accountable for eighty-nine kilograms of marijuana seized from his co-defendants as well as an additional twelve kilograms from previous shipments.[2] The court also found that Suarez was a manager or supervisor of at least one other participant in the conspiracy, and enhanced his sentence on that basis. We affirmed the district court's judgment on direct appeal. *United States v. Suarez*, 2000 WL 197927 (7th Cir. Feb. 8, 2000).

Approximately three years after Suarez was released from prison, the United States filed a complaint to revoke his naturalization under three separate theories, pursuant to 8 U.S.C. § 1451(a). The complaint alleged that Suarez (1) illegally procured his naturalization

---

[2] The eighty-nine kilograms seized from Suarez's co-defendants is equal to approximately 196 pounds.

because he committed crimes that reflected adversely on his moral character, and thus lacked the good moral character required for naturalization; (2) illegally procured his naturalization because he provided false testimony to obtain citizenship when he denied that he had committed any such crimes; and (3) obtained his naturalization by willfully misrepresenting and/or concealing that he had committed these crimes. After discovery, the government moved for summary judgment on the first ground alleged, that Suarez had illegally procured his citizenship because, as a person lacking good moral character, he was ineligible for naturalization. Suarez opposed the motion, arguing that extenuating circumstances mitigated his unlawful acts and he could still be found to possess good moral character at the time of his naturalization. The district court granted judgment in favor of the United States, finding that Suarez was barred from establishing good moral character because he had committed serious crimes in the five years prior to his application, and that none of the circumstances he raised in any way mitigated his crimes. The court noted that, under Suarez's argument, a person who was convicted before applying for naturalization would be barred from citizenship, but a person who committed the same crime and managed to evade justice until after naturalization would be eligible for citizenship. Rejecting that reasoning, the court revoked Suarez's citizenship. Suarez appeals.

**II.**

Suarez contends that he cannot be found to have illegally procured his citizenship because the INS had the discretion and authority to grant his application for citizenship notwithstanding his unlawful acts. Moreover, he argues that there are genuine questions of material fact on the issue of whether extenuating circumstances mitigated his unlawful acts. Finally, he maintains that the court erred in relying on the length of his criminal sentence as evidence of the seriousness of his criminal acts. Our review of the district court's grant of summary judgment in favor of the government is *de novo*. *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

**A.**

The United States may sue to set aside the order admitting a person to citizenship and to cancel that person's certificate of naturalization "on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation[.]" 8 U.S.C. § 1451(a). Only the first ground for revocation, illegal procurement, is at issue in this appeal. The government alleged that Suarez illegally procured his citizenship because he was statutorily ineligible for naturalization at the time he sought to become a naturalized citizen. *See Fedorenko v. United States*, 449 U.S. 490, 506 (1981) (failure to comply with any of the congressionally imposed pre-

requisites of citizenship renders the certificate of citizenship illegally procured). *See also United States v. Ciurinskas*, 148 F.3d 729, 732 (7th Cir. 1998) (if a certificate of naturalization is illegally procured, a court lacks discretion to refuse to revoke citizenship). He was statutorily ineligible, the government asserted, because he lacked good moral character, a prerequisite to citizenship. *See* 8 U.S.C. § 1427(a)(3) ("No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant . . . during all the periods referred to in this subsection has been and still is a person of good moral character."). Although the statute directs the Attorney General to consider the five-year period prior to filing the application in determining good moral character, the Attorney General may also consider as a basis for the determination the applicant's conduct and acts at any time prior to that period. 8 U.S.C. § 1427(d). Suarez lacked good moral character, under the government's theory, because he had committed two serious controlled substance offenses shortly before he applied for naturalization. After he became a citizen, he was indicted, tried and convicted of possession with intent to distribute marijuana and conspiracy to possess with intent to distribute marijuana. Both charges stemmed from the shipment of nearly 200 pounds of marijuana only months before Suarez applied for citizenship.

Under section 1101(f), "[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was," among other things, "a habitual drunkard," gambler, aggravated felon,

or Nazi persecutor. 8 U.S.C. § 1101(f). The list of those lacking good moral character includes persons who have been convicted of or who have admitted committing certain controlled substance offenses. 8 U.S.C. § 1101(f)(3) and (8). Suarez was not convicted until after his application was approved and he contends that this distinction places him in a category of persons that the INS may still admit as a discretionary matter. Because the INS could have exercised its discretion to admit him, he argues that he was not statutorily barred from admission and thus cannot be considered to have illegally procured his citizenship. We see at least three possible flaws in Suarez's argument, based on our reading of the statutes and regulations.

**1.**

First, the express language of section 1101(f)(3) arguably includes in the list of persons who must be found to lack good moral character those who committed a qualifying crime during the statutory period and were later convicted for that crime:

> For the purposes of this chapter—

> No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

> * * * *

> (3) a member of one or more of the classes of persons, whether inadmissible or not, described in . . . subpara-

graphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana), *if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period*;

8 U.S.C. § 1101(f)(3) (emphasis added). Section 1182(a)(2)(A)(i), in turn, lists classes of aliens ineligible for admission:

> . . . [A]ny alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of—
>
> * * * *
>
> (II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible.

8 U.S.C. § 1182(a)(2)(A)(i)(II).

Suarez is a member of the class of persons described in section 1182(a)(2)(A) because he was convicted of two controlled substance offenses. He falls within the purview of section 1101(f)(3) as a person statutorily barred from a finding of good moral character because "the offense described therein" was "committed during such period" when one's good character must be established. In other words, under the language of section 1101(f)(3) that we highlighted above, if the offense was committed during the statutory period when an applicant must

possess good moral character, and the applicant is convicted of that offense, the applicant is statutorily barred from a finding of good moral character *no matter when the conviction occurs*. The highlighted language addresses the very problem that concerned the district court. Applicants who commit crimes that statutorily bar them from a finding of good moral character who manage to evade detection and conviction until after they have been naturalized should not and do not possess an advantage over persons who are convicted before they apply for naturalization.

Both the government and Suarez assume that the crime and the conviction must both occur within the statutory period in order for an applicant to be barred from a finding of good moral character under section 1101(f)(3). We do not read such a limitation into the statute. Section 1182(a)(2)(A)(i) provides that the alien (or, in this case, applicant) "convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of" a violation of the controlled substance laws is inadmissible. The quoted language indicates the level of proof necessary to demonstrate a violation of the controlled substance laws. That is, the person must have been convicted of the offense, or admitted committing it, or admitted the acts which make up the substance of the offense. *See Fedorenko*, 449 U.S. at 505 (the evidence against the naturalized citizen must be clear, unequivocal and convincing); *Ciurinskas*, 148 F.3d at 732 (same). There is no reason, either in the text or in the intent of these statutes, to assume that the *proof* must occur during the

statutory period. To the contrary, the *offense* must occur during the statutory period under the language of the highlighted part of section 1101(f)(3) but the proof may come at any time. To read these statutes otherwise would lead to the absurd result that the district court feared: an applicant who evaded prosecution or refused during the statutory period to admit committing a crime would have an advantage over an applicant who was convicted or who was truthful during that time period. The district court, and apparently the government, believed that only the catch-all language of section 1101(f)(8) and the accompanying regulations could remedy this peculiar result. We would be inclined to find that resort to the catch-all is not necessary, but because the government relies on the catch-all, we will address it next.

**2.**

Assuming for the sake of argument that the language we have highlighted does not apply to Suarez, there is a second way in which he was statutorily barred from a finding of good moral character. The list in section 1101(f) is expressly not all-inclusive:

> The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character.

8 U.S.C. § 1101(f). Federal regulations set forth further guidance for applying section 1101(f). In accordance with section 1101(f), the INS "shall evaluate claims of good

moral character on a case-by-case basis taking into account the elements enumerated in this section and the standards of the average citizen in the community of residence." An applicant "shall be found to lack good moral character" if, during the statutory period, the applicant, among other things:

> * * *

> (iii) [v]iolated any law of the United States, any State, or any foreign country relating to a controlled substance, provided that the violation was not a single offense for simple possession of 30 grams or less of marijuana[.]

8 C.F.R. § 316.10(b)(2). Suarez does not dispute the district court's finding or the government's argument on appeal that section 316.10(b) is entitled to *Chevron* deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984); *United States v. Jean-Baptiste*, 395 F.3d 1190, 1194 (11th Cir. 2005) (Cudahy, J., sitting by designation). The regulation requires a finding that the applicant lacks good moral character if, during the statutory period, the applicant "violated any law" of the United States relating to a controlled substance. That Suarez "violated" the law during the statutory period is sufficient under the regulation to require a finding that he lacked good moral character. And we know that he violated the law during the statutory period because he was later convicted of a controlled substance offense involving considerably more than 30 grams of marijuana where the charged

conduct occurred during the statutory period.[3] Although Suarez contends that the "case-by-case" language of section 316.10 demonstrates that the INS could have exercised its discretion to find that he possessed good moral character even though he violated the controlled substance laws, he fails to note that the INS's discretion is cabined by the mandatory language at the start of the provision: "An applicant *shall* be found to lack good moral character" if the applicant violated a qualifying controlled substance law during the statutory period. 8 C.F.R. § 316.10(b)(2) (emphasis added). A finding contrary to this mandatory language would be a *per se* abuse of discretion.

**3.**

We turn then to the third way in which Suarez can be found to have illegally procured citizenship even if neither the plain language of section 1101(f)(3) nor the mandatory language of section 316.10(b)(2) applies. A catch-all provision of 8 C.F.R. § 316.10(b)(3) specifies:

> Unless the applicant establishes extenuating circum-stances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant:
>
>     * * *

---

[3] Thirty grams amounts to slightly more than an ounce. Suarez was convicted of possession and conspiracy to possess nearly 200 pounds of marijuana.

(iii) [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b) (1) or (2).

8 C.F.R. § 316.10(b)(3). As with section 316.10(b)(2), a conviction during the statutory period is not necessary for a finding that an applicant lacks good moral character. It is enough that the offense was "committed" during that time. And as we noted above, this regulation is entitled to deference. *See Chevron*, 467 U.S. at 843-44. *See also United States v. Dang*, 488 F.3d 1135, 1140-41 (9th Cir. 2007) (according *Chevron* deference to section 316.10(b)(3) and finding that unlawful acts during the statutory period would be considered even when the conviction came after naturalization). There are thus three different paths in the statutes and regulations that would lead to the same result: Suarez illegally procured his naturalization because he was statutorily ineligible as a person lacking good moral character.

That the regulations encompass some discretion on the part of the INS in determining whether an applicant possesses good moral character does not change the result. This conclusion is bolstered by a very similar case from one of our sister circuits. Suarez, as we noted, concedes that if he had been convicted before his application was approved, he would have been statutorily ineligible for naturalization. In the absence of a conviction during the statutory period, he maintains that, under section 316.10(b)(3), the Attorney General retained

discretion to approve his application. Because of this discretion, he asserts that his citizenship cannot be characterized as "illegally procured." Although this is an issue of first impression in the Seventh Circuit, the Eleventh Circuit has held that a conviction for a qualifying controlled substance offense after naturalization, for conduct that occurred in the statutory period before naturalization, precludes an applicant from establishing good moral character under 8 U.S.C. § 1101(f)(8), as elaborated in 8 C.F.R. § 316.10(b)(3)(iii). *Jean-Baptiste*, 395 F.3d at 1194.

Suarez contends that *Jean-Baptiste* was wrongly decided because the court had not been presented with the argument he makes here. In particular, Suarez contends that because the Attorney General retained discretion to approve his application, and because no statute or regulation alone categorically precluded his citizenship, he cannot be found to have "illegally" procured citizenship. According to Suarez, only an INS examining officer exercising his or her discretion could have made the determination. He cites the INS Field Adjudicator's Manual, section 73.6(d)(3) in support of his claim that a denial of naturalization under 8 C.F.R. § 316.10(b)(3)(iii) is discretionary, and thus cannot be characterized as a statutory bar.

But we see no reason to depart from the well-reasoned decision of our sister circuit. As we noted above, we think it highly unlikely that Congress intended for applicants who, during the statutory period, commit crimes that would disqualify them from naturalization

to nonetheless slide through the loophole Suarez asks us to create if they manage to evade detection and conviction until after they are naturalized. And we have held that a court lacks discretion to refuse to revoke citizenship where it was illegally procured. *Ciurinskas*, 148 F.3d at 732. Suarez was not eligible for naturalization when, during the five years prior to his application, he committed crimes establishing a lack of good moral character, whether or not he was convicted for those crimes before his naturalization was complete. Any discretion available in different circumstances cannot change the result here.

**B.**

Section 316.10(b)(3) begins with a possible exception to the general rule that an applicant "shall be found to lack good moral character" if the applicant committed certain criminal acts during the statutory period. 8 C.F.R. § 316.10(b)(3). Suarez contends that, under that provision, he may avoid a finding that he lacks good moral character if he "establishes extenuating circumstances." *Id*. Suarez argues that he has raised genuine issues of material fact regarding extenuating circumstances that should have precluded summary judgment. In particular, he cites as extenuating circumstances that (1) the convictions at issue here were his first and only criminal convictions; (2) he played a minimal role in the offenses for which he was convicted; and (3) he received no compensation for the drug transactions at issue.

Extenuating circumstances in the context of a determination of good moral character "must pertain to the

reasons showing lack of good character, including acts negating good character, not to the consequences of these matters." *Jean-Baptiste*, 395 F.3d at 1195 (collecting cases). Extenuating circumstances are those which render a crime less reprehensible than it otherwise would be, or "tend to palliate or lessen its guilt." Black's Law Dictionary, Sixth Edition (1990). That these convictions allegedly arose from Suarez's first crimes does nothing to mitigate their seriousness. Recall that Suarez was convicted of possession with intent to distribute and conspiracy to possess with intent to distribute nearly *200 pounds* of marijuana. Setting aside the dubious proposition that any drug dealer begins his career with a 200-pound transaction, if this truly was his first offense (as opposed to his first conviction), he certainly jumped into a life of crime with both feet with a transaction of this size. A first crime of this magnitude is more damning rather than less so. Nothing about the magnitude of this first offense incident tends to minimize the seriousness of the crime.

Although Suarez would now have us believe that his role in the offense was minimal, we need only refer to our opinion on direct appeal to determine that this is simply not true. The district court adjusted Suarez's sentence upward after finding that he served as a manager or supervisor in the conspiracy. *Suarez*, 2000 WL 197927, at *3. We affirmed that enhancement, concluding that Suarez not only recruited two other conspirators but also directed their activities. Moreover, Suarez served as an indispensable middleman who found a driver willing to travel across state lines to transport a

large quantity of marijuana. Nothing about Suarez's role in the offense may be fairly described as minimal, and he may not now re-litigate issues decided in his criminal case. *See Jean-Baptiste*, 395 F.3d at 1194-95 (collateral estoppel bars a defendant who is convicted in a criminal trial from contesting the conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial). *See also In re Grand Jury Proceedings of Special April 2002 Grand Jury*, 347 F.3d 197, 201-02 (7th Cir. 2003) (setting forth the elements of collateral estoppel).

Finally, that he made no money for his role in the offense does nothing to mitigate his responsibility for the crime. First, the statutes themselves are agnostic on the question of money changing hands. The harm that the statutes at issue penalize is the distribution of controlled substances, not the sale. And the social harm caused by persons who conspire to distribute controlled substances is not lessened when the dealer makes little or no money on the transaction.

In sum, Suarez has failed to raise a genuine issue of material fact regarding extenuating circumstances. Although we are inclined to find that the plain language of section 1101(f)(3) bars a finding of good moral character for persons who commit qualifying crimes during the statutory period but who are not convicted of those offenses until after naturalization, we will not definitively decide that question here in the absence of the government's urging. Instead we conclude that the district court correctly granted summary judgment in favor of the

government because Suarez could not demonstrate the good moral character required for naturalization under the catch-all provision of section 1101(f)(8) and the accompanying regulations. Suarez's remaining arguments are without merit.

AFFIRMED.